UNITED STATES of America,
Plaintiff-Appellee,

v.

William M. RUFFIN,
Defendant-Appellant.

No. 1438, Docket 77–1160.

United States Court of Appeals,
Second Circuit.

Argued June 16, 1977.

Decided Feb. 27, 1978.

Cora T. Walker, New York City (Walker & Bailey, Lawrence R. Bailey, Jr., New York City, of counsel), for defendant-appellant.

Cheryl M. Schwartz, Asst. U. S. Atty. (David G. Trager, U. S. Atty., E.D.N.Y., Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before WATERMAN, SMITH and OAKES, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from a judgment order of the United States District Court for the Eastern District of New York, Pratt, J., convicting appellant William M. Ruffin, following a jury trial, on three counts of an eleven-count indictment charging him with various violations of the federal income tax laws. The counts on which Ruffin was found guilty charged that he had evaded income taxes, in violation of 26 U.S.C. § 7201,[1] by filing a false and fraudulent personal income tax return for the calendar year 1972 (Count IV) and by filing false and fraudulent corporate income tax returns for the calendar years 1970 and 1971 (Counts VII and VIII). Ruffin was acquitted, however, on tax evasion charges stemming from his filing of allegedly false and fraudulent personal income tax returns for the calendar years 1970 and 1971 (Counts II and III). The district court declared a mistrial on the remaining five counts of the indictment after the jury had deliberated for approximately twelve hours.

On appeal, Ruffin seeks reversal of his convictions on various grounds. His princi-pal claim is that, inasmuch as the federal prosecutors failed to provide him with "target" warnings either prior to or during his grand jury appearances, his grand jury testimony should have been suppressed and the indictment against him dismissed. Ruffin also challenges a number of evidentiary rulings made during trial and the sufficiency of the government's evidence to convict him. And finally, Ruffin contends that the district judge's jury instruction on the element of willfulness was inadequate. With one significant exception, we are not persuaded that the arguments advanced by Ruffin require the reversal of any of his convictions. We do conclude, however, that one of the district court's erroneous evidentiary rulings requires reversal of Ruffin's conviction on the charge of evading personal income taxes by his having filed a false and fraudulent personal income tax return for 1972.

Specifically, we hold that the government's failure to issue the standard "target" warnings does not vitiate Ruffin's convictions, that the evidence introduced against him was sufficient to allow the jury to find him guilty of the charges of evading corporate income taxes for 1970 and 1971 and that the judge's charge to the jury was a correct statement of the applicable law. We hold also that the first of the evidentiary rulings about which Ruffin complains, while the ruling was not free from error, nonetheless provides no basis upon which Ruffin's convictions must be reversed. In particular, although we agree with Ruffin that the district court erred in permitting introduction of a certain Internal Revenue Service (IRS) computer printout, we also find that a reversal is not required inasmuch as Ruffin's objection was not properly preserved for appeal and, moreover, the error was harmless. However, inasmuch as we agree with Ruffin's contention that prosecution rebuttal witness Hamill's testimony was, in part, inadmissible hearsay and because under the circumstances here we cannot conclude that the error resulting

---

1. 26 U.S.C. § 7201 reads, in pertinent part:
   Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . .

from the introduction of that testimony was harmless with reference to Ruffin's conviction on the charge of evading his personal income tax for the calendar year 1972, we reverse Ruffin's conviction on that charge. As to the convictions for evading corporate income taxes for the calendar years 1970 and 1971, we affirm, for the erroneous introduction of Hamill's hearsay testimony could not have influenced the jury's verdict on those counts of the indictment. Finally, for reasons explained later in this opinion, we do not remand the case for either retrial on the count on which we reverse or for reconsideration of the concurrent sentences imposed on those of Ruffin's convictions which we affirm, but we do vacate the $5,000 fine imposed by the judgment of conviction and we remand for the limited purpose of permitting the district court to reconsider whether, in view of our reversal of Ruffin's conviction on Count IV, the court wishes to modify the fine it previously imposed.

The factual setting of this case is relatively uncomplicated. In early 1975, a Special Grand Jury sitting in the Eastern District of New York was investigating misuse of funds by Bedford-Stuyvesant Youth-in-Action, a federally funded antipoverty program operating in Brooklyn. Ruffin was subpoenaed to produce records of a lease executed between the Bedford-Stuyvesant Community Corporation Young Mothers Program, as lessee, and either himself or his wholly-owned corporation, Rugore Associates (Rugore), which he served as president, as lessor. Ruffin was summoned to appear before a grand jury and, prior to his interrogation there on March 7, 1975, Ruffin was advised of his right to counsel, of his right not to incriminate himself [2] and of the fact that any answers he might give could subsequently be used against him in a court of law. The questioning before the grand jury revealed that the rental property which was the subject of the lease generat-

ed annual rental income of approximately $30,000, that the corporation had last filed an income tax return in 1971 and that Ruffin had not reported the income on his personal returns.

One week later, on March 14, 1975, Ruffin made a second appearance before the grand jury. Again he was informed of his right to counsel and against self-incrimination. He was also specifically warned that he had a "tax problem" and that "in answering these questions, [he might] be implicating [him]self in violation of the Federal law." Ruffin indicated that he understood the import of the Assistant United States Attorney's cautionary words but nonetheless decided to testify.

During the week between the two grand jury sessions, one of the Assistant United States Attorneys who had been present in the grand jury room during the first session notified the IRS of Ruffin's likely failure to report income. The grand jury minutes and exhibits were subsequently turned over to the IRS pursuant to a Rule 6(e) order. Fed.R.Crim.P. 6(e). On July 14, 1975, approximately four months after Ruffin's grand jury appearances, an IRS agent read the grand jury testimony and examined the exhibits for the first time. Ruffin's first meeting with IRS agents occurred on November 4, 1975. At a December 9, 1976, pretrial hearing held to determine whether Ruffin's grand jury testimony should be suppressed, an IRS agent testified that as of November 4, 1975, no decision had been made whether to recommend prosecution for any violations of the Internal Revenue Code. Of course, as already mentioned, defendant was, in fact, ultimately indicted on eleven counts and convicted on three.

At trial the government adduced proof which the jury reasonably could have credited indicating that the Young Mothers Program had made almost $150,000 in rental

---

**2.** Ruffin was actually advised by the Assistant United States Attorney who was about to question him that "[y]ou don't have to answer any questions that we pose to you." As in *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), "[t]his was an obvious overstatement of [the witness's] constitutional rights." *Id.* at 183, 97 S.Ct. at 1817.

payments by checks payable to Ruffin.[3] This amount represented five years of rental payments for the building at 1402 Bedford Avenue,[4] a building which was never occupied[5] by the Young Mothers Program. Neither Ruffin's individual returns for 1969–74, nor Rugore's corporate returns (for those years in which it even filed returns, i. e., 1970 and 1971) reported the rental income. Rugore filed no returns at all for 1972–74. The individual and corporate returns were signed solely by Ruffin. No outside tax preparer's signature appeared on any of the returns.

All of the rental income was deposited in two bank accounts, one checking and one savings, both of which were exclusively in Ruffin's name. Some checks were written to cover expenses of the 1402 Bedford Avenue property. During 1972, as was true of the other years between 1969 and 1974, however, Ruffin used the checking account, supposedly opened for Rugore, for purposes which the government argued were related not to Rugore's business activities but rather to the personal benefit or business interests of Ruffin and his friends. For exam-

ple, drawing upon the checking account he had allegedly opened for Rugore, Ruffin used Rugore's money to pay the bills of another corporation of which Ruffin was the principal, to cover payments to the Ford Motor Credit Corporation, to satisfy installment loan obligations, to make payments which the jury might have taken to be gifts to Mrs. DeFreitas, the head of the Young Mothers Program, and to make a payment to the parking violations bureau. The government considered these specific diversions of corporate money, and others, to constitute constructive dividends[6] from Rugore to Ruffin and hence income properly reportable on Ruffin's personal income tax returns.[7]

## I

■ Ruffin vigorously presses his claim that the government's failure to inform him that he was a grand jury target violated his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel. We need not reach these constitutional issues,[8] however, inasmuch as we

3. The trial testimony established that Ruffin acknowledged receipt of the rental checks by signing rent receipts in his individual capacity.

4. In September 1969 title to the property was transferred to Rugore by Ruffin, who had originally purchased the property in his individual capacity.

5. Building renovations which the lessor had undertaken to make were never, in fact, made.

6. Corporate money diverted to the personal use or control of a shareholder constitutes a constructive dividend only to the extent that the diversions are distributions from the corporation's earnings and profits. See DiZenzo v. Commissioner of Internal Revenue, 348 F.2d 122, 125–27 (2d Cir. 1965). Here, Ruffin has not asserted that the amounts diverted could not be a constructive dividend because not made out of current or accumulated earnings and profits. Indeed, he would have a difficult time supporting such a position in view of DiZenzo's placement of the burden of persuasion, in cases where, as here, the corporation has maintained hopelessly inadequate records, on individual taxpayers to show that earnings and profits do not equal amounts diverted to the shareholders. Id. at 126–27.

7. Both the government's and the appellant's versions of the reconstructed tax returns of Ruffin and Rugore are reproduced in the Appendix located at the end of this opinion.

8. We note parenthetically that Ruffin's constitutional claims directed to the validity of the indictment seem insubstantial, for the Supreme Court has recently noted that "an indictment returned by a properly constituted grand jury is not subject to challenge on the ground that it was based on unconstitutionally obtained evidence." United States v. Washington, 431 U.S. 181, 185 n. 3, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977) (citing United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)). Cf. United States v. Mandujano, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (grand jury witnesses, including targets, may be convicted of perjury based on false grand jury testimony even though not advised of fifth amendment privilege against self-incrimination). Moreover, it is now evident that a prosecutor's failure to issue "target warnings" does not violate any of the witness's constitutional rights. More particularly, the Supreme Court has recently stated in United

agree with the district judge that at the time Ruffin made his incriminating admissions in his appearance before the grand jury on March 7, 1975, he was not entitled to "target warnings" because he was not at that time a target of the grand jury investigation.

■ At the December 9, 1976 suppression hearing, the district judge specifically found that on March 7, 1975, when Ruffin was first called before the grand jury, he was not a target. This finding is in no respect undercut by the record. To the contrary, the record indicates that Ruffin was called as a substantive witness in the investigation of the federally funded antipoverty program. He was subpoenaed to produce records of the rental agreement between him (or Rugore) and the Young Mothers Program. Significantly, the subpoena did not demand production of either Ruffin's personal tax returns or the corporate returns for Rugore. Indeed, the questioning at that initial grand jury session focused on the leasing of the property to the antipoverty program. It so happens, however, that *during* that initial appearance Ruffin, quite unexpectedly, stated that he had not reported the rental income on either his or Rugore's corporate tax returns which had been filed for the years in which that income had been received. Relative to these apparent, and unexpected, admissions of criminal conduct, the district judge ruled that there was no requirement "that whenever testimony [comes] up in the grand jury proceeding . . . fortuitously showing that someone else other than the then subjects of the investigation may have been criminally responsible for *other* activities, [the witnesses then testifying] must be [immediately] warned that they, too, may be the subject of the investigation." (Emphasis supplied.) We conclude that the district

judge was correct in his assessment that an unanticipated admission of apparent criminal conduct unrelated to the conduct then being investigated by the grand jury does not automatically and instantaneously transform an ordinary witness into a "target witness" who is entitled, at that point anyway, to receive the standard "target warnings." Moreover, our review of the specific interrogation conducted by the Assistant United States Attorney during Ruffin's initial grand jury appearance convinces us that the prosecutor, at least in the context of the specific colloquy between Ruffin and him at the grand jury session at which the incriminating remarks were uttered, was not required to issue a target warning to Ruffin at any time during that session.

■ When Ruffin was called for a second appearance before the grand jury one week later, however, he conceivably may have been in a different posture than the one in which he had been prior to and during his initial appearance before the grand jury on March 7, 1975. Specifically, in contrast to its genuine lack of awareness prior to Ruffin's initial appearance, the government, prior to Ruffin's second appearance before the grand jury, was obviously well aware that there was a strong possibility that Ruffin had engaged in criminal conduct by failing to report substantial sums of income to the Internal Revenue Service. Moreover, in contrast to what had been demanded of him prior to his first appearance before the grand jury, this time Ruffin *was* requested to produce his personal and Rugore's corporate tax returns. However, even if, as is somewhat unlikely, Ruffin had indeed become a target following his first grand jury appearance on March 7, the questioning at the second grand jury ap-

States v. Washington, *supra,* 431 U.S. at 189, 97 S.Ct. at 1820:

> [W]e do not understand what constitutional disadvantage a failure to give potential defendant warnings could possibly inflict on a grand jury witness, whether or not he has received other warnings. It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury, and wit-

> nesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are. Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential defendant warnings add nothing of value to protection of Fifth Amendment rights.

pearance focused almost exclusively on matters other than his or Rugore's "tax problem." In fact, only one question was directed to Ruffin concerning the "tax problem" which ultimately formed the basis of the indictment against him, and that was merely a question repetitive of a question previously asked and answered at the March 7, 1975 session when, as we have stated, Ruffin clearly was not a target.[9] The government's failure to pursue extensive inquiry into Ruffin's "tax problem" is really not surprising, however, in view of the fact that the grand jury was then investigating misuse of federal antipoverty funds and not a taxpayer's income tax evasion. Finally, if target warnings were appropriate under the circumstances here, Ruffin, in effect, received them. In particular, not only was he warned that he could consult an attorney, that he could have an attorney appointed if he could not afford one, that he had a right to refuse to answer any questions which might tend to incriminate him and that any answers which he might give could subsequently be used against him in a court of law, but he was also specifically warned by the prosecutor that he had a "tax problem" and that "in fairness to you, Mr. Ruffin, your testimony, or in answering these questions, you may be implicating yourself in violation of the Federal law." Also of real importance is the fact that the · purpose of requiring the government to issue target warnings—to give the potential defendant fair warning of his predicament—was clearly not frustrated here, for, as the district court found, Ruffin was fully cognizant of the fact that the answers he had given at the first grand jury session had drawn the government's attention to possible criminal violations committed by him. It is thus clear that in no way has any governmental misconduct during the grand jury proceedings prejudiced the appellant in this case.[10]

## II

■ Ruffin next challenges the sufficiency of the evidence to support his convictions of evading corporate and personal income taxes. In view of our finding in Part VI that Ruffin's conviction for evading personal income taxes must be reversed because of the erroneous introduction of hearsay testimony, irrespective of the sufficiency of the evidence presented against him on that charge, we have no occasion here to determine whether that evidence was, in fact, sufficient to sustain his conviction on that count of the indictment. However, viewing the evidence in the light most favorable to the government, *Glasser v. United States,*

**9.** In view of our conclusions that Ruffin was not a target at his March 7 appearance, and that his March 14 appearance, regardless of whether he had at that point become a target, did not advance the government's tax investigation, Ruffin cannot claim that his indictment, even if it were derived from the answers Ruffin gave at the March 7 session, was an unlawful "fruit" of his grand jury appearances. The same reasoning applies to rebut Ruffin's argument that certain documents introduced at trial were the "tainted fruit" of the testimony he gave before the grand jury.

**10.** Because of our disposition of the appeal, we need not settle the propriety of Ruffin's request that we exercise our supervisory power to dismiss the indictment. We note, however, that Ruffin's reliance on the discretionary dismissal of a perjury indictment in *United States v. Jacobs,* 547 F.2d 772 (2d Cir. 1976), *cert. granted,* 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), where the putative defendant was not informed that she was a target, is misplaced. In *Jacobs,* the court, exercising its supervisory

authority to assure uniformity of treatment of grand jury targets throughout the Second Circuit, did not *dismiss* the perjury count to punish the egregious government misconduct which occurred in that case. Rather, the court *suppressed* the defendant's grand jury statements. That suppression in turn necessitated a "concomitant dismissal of the perjury count for lack of a predicate." *Id.* at 778. The basic remedy employed in *Jacobs,* therefore, was the suppression of statements, not a dismissal of the indictment. Thus, even if Ruffin were a target, and even if the prosecutors were constructing a strategic trap for him as they did in *Jacobs,* the appropriate remedy, in the first instance, would have been suppression of the grand jury testimony.

We recognize that at a certain point government misconduct may infect the indictment itself such that suppression may be an inadequate remedy. *See United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972). That is not this case, however.

315. U.S. 60, 80, 62 S.Ct. 45, 86 L.Ed. 680 (1942), and construing all permissible inferences in the government's favor, *United States v. Marchisio,* 344 F.2d 653, 662 (2d Cir. 1965); *United States v. Dardi,* 330 F.2d 316, 325 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964), our review of the record does convince us that there was ample enough evidence for the jury to have found that appellant willfully evaded Rugore's corporate income taxes for 1970 and 1971. Without going into unnecessary detail, we note that Ruffin himself collected the rent checks which were payable to him personally and which he then deposited in bank accounts opened solely in his name. Ruffin, a well-educated man with considerable business experience, particularly in the field of real estate, prepared his own and Rugore's tax returns. He was sufficiently knowledgeable to take bad debt and depreciation deductions and to report rental income from the lease of other property. Yet, on the 1970 and 1971 corporate returns he filed on behalf of Rugore, he reported the amount of gross income as "none," when, in fact, as Ruffin's own expert tax consultant conceded, the corporation had gross incomes for the calendar years 1970 and 1971 of $28,410.96 and $30,153.53, respectively, and resultant increases in corporate tax liabilities for those years of $3,875.00 and $4,003.00, respectively. Moreover, the receipt of these substantial rental incomes on the property at 1402 Bedford Avenue was in no way whatever reflected on the personal income tax returns that Ruffin filed for those years. Upon the basis of the foregoing and the other evidence before them, the jury could reasonably have found that Ruffin knew of his obligation to include the rental receipts as gross income on Rugore's corporate income tax return and that his failure to do so was a willful attempt to evade payment of the corporate income taxes due from Rugore for the calendar years 1970 and 1971.

### III

■ We find no merit in appellant's assignments of error in the court's charge to the jury. Instructions on the element of willfulness fairly stated the law. Appellant had requested the court to charge that "careless disregard" does not satisfy the willfulness standard. The court charged:

An act is done willfully if it is done voluntarily and intentaonally [*sic*] and with the specific intent to do something that the law forbids. That is to say, it connotes a voluntary, intentional violation of a known legal duty.

.    .    .    .    .

Mere negligence, even gross negligence, is not sufficient to constitute willfulness. A defendant is not willfully evading a tax if it is shown that he is merely careless in keeping his books or if he made errors of judgment or if he failed to hire a competent bookkeeper or accountant.

The admonition that even "gross negligence" would not suffice to satisfy the willfulness standard clearly complied with this request.

■ Moreover, Ruffin's assertion that the district court erred in failing to charge, as requested by Ruffin, that the defendant must have been animated by an "evil motive" or by "bad faith" is untenable. Willfulness is "a voluntary, intentional violation of a known legal duty." *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976) (per curiam). There need be no finding of "bad purpose or evil motive." *Id.* at 11, 97 S.Ct. at 23.

■ The district judge also charged the jury correctly concerning the defendant's knowledge of the contents of the tax returns. The judge instructed (emphasis supplied):

As to whether the defendant was aware of the contents of his personal returns and of the tax returns pertaining to income of Rugore Associates, you are instructed that the law is if you are further convinced beyond a reasonable doubt that the defendant, William Ruffin, signed the tax returns in question, then you *may* draw the inference to find that he had knowledge of the contents of the returns.

Appellant's argument that the jury was compelled by this instruction to find that he had knowledge of the contents of the returns is misguided. The jury was only permitted so to find. *See United States v. Tolkow,* 532 F.2d 853, 857 (2d Cir. 1976) (undisputed signature on return is prima facie proof of knowledge of contents); *United States v. Romanow,* 505 F.2d 813, 814–15 (1st Cir. 1974). Moreover, inasmuch as it was uncontroverted that Ruffin prepared the returns, the jury had additional grounds for reasonably finding that Ruffin had knowledge of their contents.

Ruffin additionally argues that the charge compelled the jury to find that Ruffin knew the contents of the returns were false. This argument must also be rejected. The charge made clear that, in addition to the signature, the jury had to find some additional affirmative act by Ruffin in furtherance of his intent to defraud the government of taxes before it could conclude that he knew that the contents of the returns were false.

## IV

Ruffin also claims that he should have been allowed to introduce into evidence testimony that the building in question had a five-year useful life and that accordingly the corporation was entitled to depreciation deductions based on a five-year writeoff. After a voir dire was held at which appellant's accountant and tax consultant testified, the district judge excluded the proffered testimony. We believe that the judge's ruling was sound.

The appropriate legal standard for determining depreciation deductions is set forth in the Internal Revenue Code Regulations: "The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made." 26 ·C.F.R. § 1.167(b)–O(a). Appellant's accountant Kladerman testified that he would have used a twenty-year useful life if he had prepared Rugore's tax returns in 1969 and that a five-year useful life, first suggested in 1976, was derived solely with the benefit of hindsight. And while appellant's tax consultant Stewart testified that if the building were structurally unsound in 1969, a five-year useful life might have been appropriate, he conceded that this projection did not account for the lease obligation requiring Rugore to renovate the property and stated that his opinion would have been different if the renovation had been completed.

On the basis of the facts known to Ruffin in 1970, 1971 and 1972, the court specifically found that a five-year writeoff was not justified because the building was not valueless simply because it was not habitable without alterations. Because Ruffin could not show that the building was without value after five years, the testimony based on hindsight that the building had a five-year useful life was not at all probative of the fact that the building was valueless or thought to be valueless during the tax years in question. Inasmuch as the proffered testimony was irrelevant, the district judge properly excluded it. *See United States v. Vardine,* 305 F.2d 60, 64 (2d Cir. 1962); Fed.R.Evid. 104(a), 402.

## V

Ruffin next urges that the district court erred in admitting into evidence an IRS computer printout· which allegedly contained a coded notation that Ruffin had at some indefinite time in the past contacted the IRS and stated to some unidentified IRS official that Rugore was not required to file a corporate income tax return for the 1972 calendar year. Although Ruffin did object to the introduction of the printout at trial, the basis of the objection he voiced there, irrelevancy, is not the same ground he now urges upon us, namely, that the proffered evidence was hearsay, was not admissible under any exception to the hearsay rule and was therefore inadmissible by virtue of Fed.R.Evid. 802. Inasmuch as he did not assert "the specific ground of objection," Fed.R.Evid. 103(a)(1) he now argues to us on appeal Ruffin's claim of error has been waived. Fed.R.Evid. 103(a).

■ If we were to reach the merits of his contention that the district court should have excluded the printout on hearsay grounds, we would indeed agree with Ruffin that the printouts should not have been admitted into evidence. The government's reliance on Fed.R.Evid. 1005 [11] is misplaced inasmuch as that rule does not purport to guarantee the admissibility of the contents of public records but only insures that those contents may under the conditions specified in Fed.R.Evid. 1005 be introduced by way of copy rather than production of the original but *only* "if [the contents of the original record are] otherwise admissible." Here, it is clear that the contents of the printout are not "otherwise admissible," for that document is unquestionably hearsay, Fed.R. Evid. 801(c), and, under our recent decision in *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977), the IRS printout could not fit within any of the hearsay exceptions set forth in Fed.R.Evid. 803 and 804. The printout was therefore inadmissible against Ruffin. Fed.R.Evid. 802.[12]

■ Upon the basis of an exhaustive canvass of the legislative history underlying the hearsay rules in general and the hearsay exceptions set forth in Fed.R.Evid. 803(8)(B) and (C) in particular, we held in *United States v. Oates, supra,* 560 F.2d at 84, that, despite the fact that particular public records or reports may appear to satisfy the standards of one of the numerous hearsay exceptions set forth in the Federal Rules of Evidence, "in criminal cases [records,] reports [, statements or data compilations, in any form,] of public [offices or] agencies setting forth matters observed by police officers and other law enforcement personnel . . . cannot satisfy the standards of any hearsay exception if those reports are sought to be introduced against

the accused." In view of the broad reading which *Oates* accorded to the language "other law enforcement personnel," *see* 560 F.2d at 67–68 (Customs Service chemists found to qualify as "other law enforcement personnel"), there surely can be no question here that IRS personnel who gather data and information and commit that information to records which are routinely used in criminal prosecutions are performing what can legitimately be characterized as a law enforcement function. It thus follows that the printout which was introduced against Ruffin here was a record of a public agency setting forth matters observed by law enforcement personnel and, under our holding in *Oates,* that law enforcement record was inadmissible against Ruffin. By way of a concluding remark, we should note, however, that the error resulting from the admission of the computer printout was apparently harmless inasmuch as the printout was introduced solely to show that a corporate tax return for Rugore had not been filed for the 1972 calendar tax year. Ruffin was not ultimately convicted of failing to file such a return for the corporation or of evading Rugore's corporate income taxes for the calendar year 1972 and thus, under the standards employed on appellate review of criminal convictions to determine whether trial court error was "harmless," standards which we comprehensively describe in Part VI of this opinion, it is likely that the jury was not influenced by the erroneous introduction of the evidence.

## VI

■ Advancing three independent grounds, Ruffin has also challenged the admissibility of the government's rebuttal testimony that certain expenditures of Rugore funds were not used to purchase property

11. Fed.R.Evid. 1005 states:

The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with rule 902 or testified to be correct by a witness who has compared it with the original. If a copy

which complies with the foregoing cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given.

12. Insofar as the printout purported to report what Ruffin had told an IRS employee, the printout was "[h]earsay included within hearsay," Fed.R.Evid. 805, a concept upon which we elaborate in Part VI of this opinion.

at 1418 Bedford Avenue as an investment for the corporation but rather to buy for Ruffin a $26,000 mortgage on that property. Ruffin first urges that the testimony of FBI agent Hamill was improper rebuttal. We disagree, for the purpose of the testimony was to rebut directly Ruffin's defense of insubstantial tax liability by showing that Ruffin had received a constructive dividend of substantial magnitude by using corporate money to purchase a mortgage in his own name. Inasmuch as the government's evidence was directed at a material issue of fact, the district judge did not abuse his discretion by admitting the evidence on the government's rebuttal case. *See United States v. Johnson,* 208 F.2d 404, 406 (2d Cir. 1953), *cert. denied,* 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1080 (1954).

██ Ruffin next argues that the district court erred in finding the government's rebuttal witness Hamill qualified to give opinion testimony on the meaning of certain documents relating to the creation of interests in real property. More particularly, Ruffin claims that only an attorney admitted to practice in New York State would be qualified to conduct a title search and to testify that the documents reflected an assignment of mortgages rather than a purchase of property. However, Ruffin has misunderstood the import of Rule 702 of the Federal Rules of Evidence which provides that a witness may be qualified as an expert by his "knowledge, skill, experience, training, or education." Hamill has a J. D. degree, spent four years in the Intelligence Division of the IRS, from which he derived much title search experience, and previously worked in the trusts and estates department of a New York City bank. While Hamill's credentials may not have been beyond question, the district court did not abuse its discretion, *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), in finding the witness qualified to offer the opinion testimony he eventually was to give.

██ The third ground upon which Ruffin claims Hamill's testimony was objectionable is that the important features of that testimony were hearsay. We agree. By having Hamill testify as to what various documents in the land records in the county clerk's office said, the government was eliciting from the witness classic "multiple hearsay," *United States v. Maddox,* 444 F.2d 148, 150 (2d Cir. 1971); *Felice v. Long Island Railroad Co.,* 426 F.2d 192, 197 (2d Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *Yates v. Bair Transport, Inc.,* 249 F.Supp. 681, 684–85 (S.D.N.Y. 1965), or, as characterized in the Federal Rules of Evidence, "[h]earsay included within hearsay." Fed.R.Evid. 805. Inasmuch as it was offered to prove the truth of the matters asserted in the missing documents, Hamill's testimony as to the contents of those documents was clearly hearsay. Moreover, the subject matter of his testimony, the documents themselves, if they were to have been introduced at trial for the purpose of proving the matters asserted in them, would also have been hearsay. Thus, under Fed.R.Evid. 802 and under Fed.R.Evid. 805, which codifies the approach previously employed in this circuit, *see, e. g., United States v. Maddox, supra,* 444 F.2d at 150; *Felice v. Long Island Railroad Co., supra,* 426 F.2d at 197, Hamill's testimony should have been excluded unless each of its two separate hearsay components independently satisfied some hearsay exception set forth in Rules 803 and 804 of the Federal Rules of Evidence. On the initial level the mortgage which Ruffin allegedly purchased in his own name by use of Rugore corporate funds would itself satisfy Fed.R.Evid. 803(14), the hearsay exception for "[r]ecords of documents affecting an interest in property." But Hamill's recitation of the contents of the document, if offered, as it was here, to prove the truth of the matters asserted in the mortgage, cannot satisfy any hearsay exception set forth in Fed.R.Evid. 803 or 804. Indeed, the district judge recognized as much and clearly understood that the testimony was hearsay. Yet, out of an understandable concern that the trial not be delayed several days while the prosecution attempted to procure admissible copies of the original documents, the judge decided that he would

allow it to be introduced anyway and, in a commendable attempt to be fair to the defendant, Judge Pratt offered to call, and did call when requested to do so by the defense, a recess to give defense counsel an opportunity to examine the documents before cross-examining Hamill.

While we can certainly sympathize with the court's concern, we believe that the judge's decision to allow Hamill's testimony regarding the contents of the documents was erroneous inasmuch as it clearly frustrated the legislative intent underlying the enactment of Fed.R.Evid. 803(24). Apparently realizing that admission of Hamill's hearsay testimony was error unless that testimony could satisfy some exception (or exceptions) to the hearsay rule, the government argues on appeal that Hamill's testimony was admissible under that so-called "open-ended" exception to the hearsay rule. We disagree, for as Rule 803(24) clearly requires and, as we stressed in *United States v. Oates, supra,* 560 F.2d at 72 n.30, that provision can be utilized *only* if notice of an intention to rely upon it is given in advance of trial. "There is [, moreover,] absolutely no doubt that Congress intended that the requirement of advance notice be rigidly enforced." *United States v. Oates, supra,* 560 F.2d at 72 n.30. For example, the legislator who was perhaps most knowledgeable about the soon-to-be-adopted rules of evidence stated: "We met with opposition [on the requirement of advance notice.] There were amendments offered that would let them do this right on into trial. But we thought the requirement should stop prior to trial and they would have to give notice before trial. That is how we sought to protect them." 120 Cong.Rec. H12256 (daily ed. December 18, 1974) (remarks of Representative Hungate); *accord,* 120 Cong.Rec. H12256–57 (daily ed. December 18, 1974) (remarks of Representative Dennis). In view of this clear congressional intent, we deem as irrelevant the supposed fact, pressed upon us by the government but disputed by the defense, that the government was unaware until the defense testimony of expert witnesses Kladerman and Stewart that there was any need to obtain the property documents concerning which Hamill ultimately testified. In concluding, though, that Hamill's testimony was improperly admitted, we again would stress that the procedure Judge Pratt chose to employ here might have been, in theory anyway, perhaps the most efficient and evenhanded way to deal with the troublesome problem with which he was confronted. But, when Congress has spoken, our function is not to develop procedures as we think they might ideally be developed but rather to enforce the congressional intent which finds expression in legislative enactments such as the Federal Rules of Evidence. Our approval of Judge Pratt's procedure here would, however, countenance outright circumvention of the carefully considered and drafted requirements of Fed.R.Evid. 803(24) and we thus are constrained to hold that the defense's objection to Hamill's testimony regarding the contents of the property documents he had examined should have been sustained.

Having decided that error was committed, we must now determine whether that error was harmless. The standards which an appellate court must employ to decide whether an error of nonconstitutional dimension was harmless, although not susceptible of facile application, are at least well-recognized. As Judge Friendly pointed out in *United States v. Frank,* 494 F.2d 145, 161 n.19 (2d Cir. 1974), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974), "[a]lthough the 'harmless error' statute construed in *Kotteakos* [*v. United States,* 328 U.S. 750, 757, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)], § 269 of the Judicial Code, . . . has been replaced by 28 U.S.C. § 2111, the views expressed in *Kotteakos* remain authoritative." *Accord,* 3 C. Wright, Federal Practice and Procedure: Criminal § 853, at 354–355 (1969 and 1977 Supp.). It is important to emphasize, as did the court in *Kotteakos,* that the test of whether an error is harmless is *not* whether, on the required review of the entire record, *Kotteakos v. United States, supra,* 328 U.S. at 762, 764, 66 S.Ct. 1239, the appellate court believes that, disregarding the erroneously intro-

duced evidence, there was other evidence which was independently sufficient to establish the defendant's guilt. Instead, the standard involves an analysis of the manner in which, in the total setting of the case, the error influenced the jury:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. ·It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States, supra,* 328 U.S. at 764–65, 66 S.Ct. at 1248.

Applying the *Kotteakos* test here, we conclude, first of all, that our "conviction is sure that the [erroneous introduction of Hamill's hearsay testimony] did not influence the jury" when it determined Ruffin guilty as charged of evading Rugore's corporate income taxes for the calendar years 1970 and 1971. As to Ruffin's conviction of evading personal income taxes for 1972, however, we are persuaded that Hamill's testimony, by helping to prove a very substantial diversion of corporate funds during 1972, and also by allowing the government to argue, as it did, that Ruffin was a liar, *did* influence the jury's verdict and, inasmuch as we are "left in grave doubt" as to whether the effect of the admission of that evidence was "very slight," we cannot conclude that the error was harmless. Accordingly, we reverse Ruffin's conviction on Count IV of the indictment.

We recognize that there is no question that the government presented proof that during 1972, as he had in other years, Ruffin engineered what appeared to be substantial diversions of Rugore's corporate funds and thereby incurred substantially increased personal income tax liability. Indeed, it is significant that Ruffin's own expert witness, tax accountant Stewart, conceded that Ruffin had effected diversions exceeding $5,000 during 1972 and, to be sure, the importance of this concession is further demonstrated by the fact that the jury asked to have Stewart's testimony reread. To this amount the jury could reasonably have added the Rugore corporate funds Ruffin diverted during 1972 to pay the expenses of the 1410 Corporation, another Ruffin enterprise ($2,341.45), to enrich Mrs. DeFreitas ($3,410.00), to cover what appeared to be car payments to the Ford Motor Credit Corporation ($807.48) and to pay a parking ticket issued by the parking violations bureau ($50.00). With these amounts added to the $5,050.00 conceded by Stewart, Ruffin's unreported gross and taxable income would reach the not insubstantial amount of $11,658.93. In addition, to this total the jury might also have added the Rugore moneys Ruffin used during 1972 to repay loans from the ·First National City Bank ($2,032.44 repaid during 1972) and the King's County Lafayette Trust ($3,264.00 repaid during 1972). The aggregate diversion of $16,955.37 is surely not an insignificant sum and the jury might have been entitled to find that the increase in Ruffin's tax liability resulting from his failure to report these substantial diversions was also a substantial one. It may well be that this evidence of significant underreporting of income and substantially increased tax liability, combined with the other evidence tending to establish the willfulness of the failure to report substantial sums of taxable income, was sufficient to prove Ruffin's guilt of evading a portion of his 1972 personal income taxes. But, as we stressed earlier, the erroneous introduction of evidence can be prejudicial even though, as may have been true here, there was sufficient other evidence to sustain the con-

viction. The crucial question is whether the error influenced the jury's verdict. Only if "our conviction is sure that the error did not influence the jury or had but very slight effect" can Ruffin's conviction for evading personal income taxes stand.

There are several significant reasons why we lack such conviction here. First, the jury may well have concluded that during 1972 Ruffin diverted as much as $8,396.68 of Rugore's money to purchase for himself the $26,000.00 mortgage on the property at 1418 Bedford Avenue.[13] The magnitude of such a diversion could obviously have had a strong impact on the jury's verdict. Second, and most importantly, the corporate diversion associated with Ruffin's use of Rugore's funds to purchase a mortgage in his own name probably must have been in the forefront of the jurors' minds when they retired to deliberate. This appears to be evident from the extent to which the prosecutor dwelt upon that particular point during both his opening summation[14] and his rebuttal.[15] Third, the fact that the prosecutor vigorously argued that Ruffin was a liar inasmuch as Ruffin's purchase of the mortgage for himself, as established by Hamill's testimony, was completely inconsistent with Ruffin's representation to Rugore's accountants, Kladerman and Stewart, that any expenditures relating to the property at 1418 Bedford Avenue were for the purpose of an investment in land by Rugore.[16] Fourth, in contrast to the introduction of evidence during the government's case in chief, when each piece of evidence is certainly not crucial, it can be safely presumed that evidence introduced during the government's rebuttal case is being introduced for the very reason that there is a pressing need to answer specific points raised during the defense's presentation of its case. This was undoubtedly true here, for the government, in effectively arguing that Hamill's testimony was within the legitimate scope of its rebuttal case, acknowledges that the evidence was important and, as noted, the prosecutor regarded the evidence to be crucial enough to deserve a place of real prominence in his extended remarks to the jury. Finally, the importance of Hamill's testimony, relating as it does to the 1972 year only, is suggested by the fact that the jury failed to convict Ruffin on any of the other counts in the

**13.** The actual amount of the diversion is a matter of some question. At the very least, the jury undoubtedly could have found that four checks of $411.67 each (checks numbered 352, 368, 379 and 380) which Ruffin had issued to one Howard Schwartz were issued as partial payment on Ruffin's purchase of one of the mortgages for 1418 Bedford Avenue. There was an additional check (no. 358) issued for the same purpose but Ruffin issued a stop-payment order on this check. Furthermore, there seems to have been another check which the jury could have found was issued as an apparent final payment on Ruffin's purchase of the mortgage. In particular, Government Exhibit No. 22, Ruffin's check register, indicates that check no. 389, dated July 6, 1972, was issued to Howard Schwartz in the amount of $6,750, the amount which the testimony at trial indicated was the agreed upon purchase price for the mortgage. Although the register also indicates that this particular check was "VOID," the register also shows that a new check, no. 392, in the same amount of $6,750 was issued that very day, but to the King's Lafayette Bank rather than to Schwartz. Government Exhibit No. 7, a copy of the records of the checking account Ruffin had opened, supposedly for Rugore, at the King's County Lafayette Trust Company (which by July 6, 1972 had become the King's Lafayette Bank), shows that the bank did, in fact, make payment during July of 1972 on a check in the amount of $6,750. Thus, on all the evidence the jury may have inferred that check no. 392, though issued to the King's Lafayette Bank, was somehow connected to Ruffin's purchase of one of the mortgages on the property at 1418 Bedford Avenue and that the total amount of Rugore's money expended by Ruffin for that purpose reached $8,396.68.

**14.** Trial transcript at 648–50.

**15.** Trial transcript at 692–96, 708–10.

**16.** Trial transcript at 692–96, 709. It goes without saying, of course, that the government's accusation that Ruffin was a liar went directly to the issue of Ruffin's character, in particular his honesty and veracity, for Ruffin had put his character in issue by calling numerous character witnesses who without exception testified that Ruffin's reputation for truth and veracity was outstanding. That Ruffin lied concerning the nature of his interest in the property at 1418 Bedford Avenue would also demonstrate his consciousness of his guilt.

indictment charging evasion of personal income taxes for years other than 1972; indeed, the jury acquitted Ruffin on the charges that he had evaded a portion of his personal income taxes due for the years 1970 and 1971. We thus believe that there is a reasonable possibility that it was the prosecution's repeated allusions to the diversions resulting from Ruffin's purchase of the mortgage to 1418 Bedford Avenue that may have ultimately influenced the jury to convict on the one count of evading 1972 personal income taxes (Count IV) while refusing to convict on any of the others (Counts I, II, III and VI).

We must now determine how we should dispose of this appeal. In view of the fact that the three three-year sentences which were imposed as a result of Ruffin's three convictions were made to run concurrently there might be some question here whether the "concurrent sentence" doctrine should have precluded our review of the one defective conviction when, as we have found, Ruffin's two other convictions must be affirmed. We note, first of all, that here the doctrine does not constitute a jurisdictional bar to consideration of each and every conviction on the various counts of a multi-count indictment, *Andresen v. Maryland*, 427 U.S. 463, 469 n.4, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Benton v. Maryland*, 395 U.S. 784, 789–91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), for utilization of the doctrine lies within the discretion of the appellate court. *Andresen v. Maryland, supra*, 427 U.S. at 469 n.4, 96 S.Ct. 2737; *Barnes v. United States*, 412 U.S. 837, 848 n.16, 89 S.Ct. 2056, 37 L.Ed.2d 380 (1973). Moreover, "[s]ince *Benton*, [the Second Circuit] has in the main reviewed all counts of a multi-count conviction when concurrent sentences have been imposed even though the conviction on at least one count was clearly sustainable." *United States v. Gaines*, 460 F.2d 176, 179 (2d Cir.), *cert. denied*, 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972); *see, e. g., United States v. Vilhotti*, 452 F.2d 1186, 1187, 1190 (2d Cir. 1971), *cert. denied*, 405 U.S. 1041, 92 S.Ct. 1314, 31 L.Ed.2d 582 (1972) and 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972);

*United States v. Febre*, 425 F.2d 107, 113 (2d Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970). In addition to the fact that utilization of the concurrent sentence doctrine is now the exception rather than the rule, there is a particular reason why the doctrine cannot be applied here. While the judgment order clearly stated that "Defendant [is] sentenced on each of counts 4, 7 and 8 to imprisonment for a term of 3 years [,] Defendant to serve in a jail-type institution for a period of 2 months" and that the "[s]entences [are] to run concurrently on each of counts 4, 7 and 8," the judgment further stated that "Defendant is also fined a sum of $5,000.00." The judgment of conviction does not specify whether this fine was imposed as a penalty for Ruffin's conviction on any particular count or combination of counts or whether, as was more likely, it was designed to be a pecuniary penalty attributable in part to each of the three counts upon which Ruffin was convicted. If so, the imposition of the fine renders the concurrent sentence doctrine inapplicable, for our reversal of one of Ruffin's three convictions raises the possibility that the total punishment meted out by the judgment should perhaps be ameliorated.

Having decided that it is certainly appropriate for us to review each of Ruffin's convictions and further having determined that one of those three convictions must be reversed, we are now confronted with the question of whether the case must be remanded to the district court and, if so, for what purposes. First, in view of the fact that the three prison sentences imposed by Judge Pratt were made to run concurrently, we follow *United States v. Vilhotti, supra*, which recognized that there is a "consideration of judicial efficiency which warrants an appellate court in not remanding one count for a retrial on the merits when another count, on which . . . a concurrent sentence has been imposed, is sustained." *United States v. Gaines, supra*, 460 F.2d at 179. We see no need, moreover, for remanding to the district court for the purpose of reconsidering the concurrent jail

sentences imposed on the two convictions we have affirmed, for we are quite sure that the conviction on the reversed count could not have affected the concurrent sentences Judge Pratt imposed on the two convictions which we do not disturb. *See United States v. Gaines, supra,* 460 F.2d at 179–80; *United States v. Febre, supra,* 425 F.2d at 113–14. In particular, we believe that inasmuch as the original jail sentences imposed, all but two months of which were suspended, were not severe, "it is unlikely that resentencing [on the terms of imprisonment imposed upon Ruffin for his evasion of corporate income taxes] would result in a reduced sentence." *United States v. Febre, supra,* 425 F.2d at 114. However, in view of our inability to determine how Judge Pratt arrived at the aggregate $5,000.00 fine he imposed, we do find it necessary, in view of our reversal of Ruffin's conviction on Count IV of the indictment, to vacate that fine and to remand to the district court for the limited purpose of allowing Judge Pratt to reconsider, if he wishes, whether the $5,000.00 fine should be revised.

In summary, we uphold Ruffin's convictions on Counts VII and VIII; we reverse his conviction on Count IV; and we vacate the $5,000.00 fine imposed by the judgment of conviction and remand the case to the district court for the limited purpose of reconsidering whether that fine should be modified.

## APPENDIX

The government's version of Rugore's and Ruffin's taxable income reads:

### TAXABLE INCOME (RUGORE)

|  | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| Gross Income per Return .... | $ None | $ None | No | No | No |
| Less: Deductions per Return | (3,461.00) | 2,168.00 | Return | Return | Return |
| Taxable Income (Loss) per Return ........................... | (3,461.00) | (2,168.00) | Filed | Filed | Filed |
| Add: Unreported Rental Income ..................... | 31,200.00 | 20,700.00 | $41,200.00 | $25,000.00 | $22,500.00 |
| Less: Additional Deductions Allowed .......... | (3,469.85) | (5,198.59) | (15,876.64) | (7,431.52) | (9,478.45) |
| Corrected Taxable Income .... | 24,269.15 | 13,333.41 | 25,323.76 | 17,568.48 | 13,021.55 |
| Corrected Tax Liability ........ | 5,472.69 | 2,933.35 | 5,655.40 | 3,865.07 | 2,864.74 |
| Tax Liability per Return .... | None | None | No | Returns | Filed |
| Additional Tax Due .............. | 5,472.69 | 2,933.35 | 5,655.40 | 3,865.07 | 2,864.74 |

### TAXABLE INCOME (RUFFIN)

|  | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|
| Taxable Income per Return ........................... | 8,306.82 | 12,853.77 | 12,140.32 | 13,203.16 | 17,354.94 | 20,962.83 |
| Omitted Income (Construction [*sic*] Dividend) ........................... | 19,144.85 | 18,766.46 | 10,129.06 | 19,471.35 | 13,577.41 | 10,783.14 |
| Corrected Taxable Income ........................... | 27,451.77 | 30,820.23 | 22,269.38 | 32,674.51 | 30,932.35 | 31,745.97 |
| Corrected Tax ................ | 9,188.63 | 10,144.74 | 5,596.98 | 9,783.53 | 9,031.59 | 9,373.31 |
| Tax Deficiency .............. | 7,454.25 | 7,524.15 | 3,119.09 | 7,018.68 | 5,071.56 | 4,236.32 |

The appellant attempted to prove that Rugore's corporate and his personal returns should have read:

### TAXABLE INCOME (RUGORE)

|  | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| Gross Income | $28,410.96 | $30,153.53 | $35,005.14 | $25,007.00 | $27,507.47 |
| Taxable Income | 17,615.00 | 18,196.00 | 17,071.00 | 9,597.00 | 12,235.00 |
| Tax Liability | 3,875.00 | 4,003.00 | 3,756.00 | 2,111.00 | 2,692.00 |

### TAXABLE INCOME (RUFFIN)

|  | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|
| Increase in Taxable Income | 790.25 | 1,000.00 | None | 5,050.00 | None | 3,791.55 |
| (Constructive Dividend) Increased Tax Liability | 217.32 | 285.97 | None | 1,476.16 | None | 1,369.67 |